Dean 1109, In Re Brunetti, Mr. Sommer. Thank you, John Sommer, for the plaintiff, I mean the applicant and appellant, Eric Brunetti, reserving five minutes. Thank you for the extra time because I think there's a lot that needs to be talked about that wasn't in the briefs because there are implications that have arisen in the cases in Tam and Blackhorse. Yeah, I'll just, this is addressed to both counsel. I think we'd probably be interested, since Tam is still pending, in this case should come out if Tam goes one way and also arguments as to how this case should come out if Tam goes the other way. I will address that. I think that works in the course of my discussion, but I think sort of my overall theme is I'm no law professor or First Amendment lawyer, but I've done a lot of trademark and copyright work over the last several decades, and no one seems to talk about the practical effects and the practical implications, and I think that's what's most important. And in Tam, the question came up is, well, everyone seemed to assume that it would be unconstitutional to have this kind of limitation in the copyright context. So how is the trademark context different? And I submit it isn't. One question raised by the judge is, well, in copyright it's just automatic, in trademark it's not. Well, in fact, both statutes are essentially the same. You file the right application, you check the right boxes, and unless there's some invalidating condition, you get granted. In fact, I've filed copyright applications that have been refused because it wasn't copyrightable. I've had applications filed where they've made me change my claim, use different forms. And in fact, I've had trademark applications that I file and it goes through and the first thing I hear is I get a registration certificate. So that's not a difference. The difference is it because it's core speech, First Amendment versus not. Well, in fact, a lot of copyright is purely commercial software programs. It's just owes and wants. Versus you may have trademark applications. I mean, I think the classic case is stop the ozonization of America. Purely political speech, but it's being refused. So I don't think that's the distinction. Is there a government in the nerve over copyright versus trademark? I think for both, the public doesn't assume that the federal government has approved a movie or a book because it's got a copyright notice on it any more than it does in the trademark context. And both of them have the same issue. If you don't have a copyright registration, you don't have a federal trademark registration, enforcement isn't practical. And there's differences, which I'm going to talk about, about why that's true. Now, the first thing is the government says that speech isn't prohibited or burdened. And that's absolutely untrue. In TAM, we talked about how there was no recorded with the U.S. Customs Service. But I think that's one of the more minimal ones. There's no constructive nationwide use. So it means without a federal registration, anytime anybody in the nation can start using one of those common law trademarks under Don Donuts can continue to use it. You can't use the intent-to-use system without a federal registration. Under the intent-to-use registration, you can get your constructive first use date when you file your application. And then you can delay that at least a minimum of three years before you actually start use and your first use relates back. You can only get that with a registration. You can't get that with common law rights. No statutory damages, no attorney's fees, no presumption of ownership and secondary meaning. So in every single case, if you have only a common law trademark, you have to show clearinghouse so you can't prevent others from using your trademark for new domain names. You can't get internet websites that are offering products like eBay. eBay is one exception. Almost the others will not cancel auctions for counterfeit products without a federal registration. You can't get a security interest recorded with the PTO. So you can't borrow money. You can get a UCC1, but that's in the individual states. That's sort of a secondary way of getting who's going to lend real money on a trademark unless you have a registration and you can record that like banks do all the time with the PTO. And how do you sell your business? Because you've got nothing to sell. So I think there's an absolutely... Can you help us by addressing how TAM would affect this case one way or the other? If the disparagement provision were held unconstitutional, how would that affect this case? Is this a fortiori from that? Well, if it's held unconstitutional on TAM, then I win. I mean, Mr. Suppose TAM comes out the other way. Well, I think I win because I have my evidentiary issues. And then I also think that... Not on the constitutional ground. Well, on the constitutional issue, I have as applied, which I'd like to get to, and also on the face because I think the scandalous is broader than disparaging. And in fact, I think some disparaging becomes scandalous because nowadays, any kind of hate speech or racial slurs, I think is also scandalous. But scandalous is broader than disparaging. And in fact, it involves more core First Amendment issues. Because I don't see, or let's say, stop the exoneration of America. And this applies equally to religious names, political groups, is much broader than just the name of a band. But I think certainly if TAM wins, I win. Is there government speech? And I think the answer to that, I think, is the government in their brief in the Eastern District of Virginia at the summary judgment says, quote, issuance of a trademark registration does not amount to awarding of the U.S. government's infomatur. And I agree with that. And in fact, the argument is the R in the circle means government approval. I hold up a Häagen-Dazs kind of ice cream and you're not going to think, oh, the federal government's approved that. The public is going to think calories and wonderful things. And in fact, virtually every item in a grocery store, every item in Walmart, Target, virtually entire U.S. economy is sold, McDonald's is sold under trademarks. And no one thinks that the federal government's approving all those things. So they are in the circle of the federal registration is meaningless. We know there's no principal register per se in the physical sense. And in fact, really all that counts is the bundle of rights. My client wants the bundle of rights. He doesn't need the registration per se. And in fact, the registration certificate, which is the only government speech that they can point to, is all a form. The only thing that varies from one registration certificate to another is the brand that's selected by the applicant, not selected by the government, and the identification of goods and other things that are specific. So it's the rights that are important. Now, what are the implications of the validity of Section 2A? Well, we know in a vulgar context that some fruits have sexual connotations and that changes over time. And of course, we have all the ethnic, Oriental, Viking, Spic, Indian. There's registration for all those. There's for devils. All these are offensive to at least some group of religious people or other ethnic groups. In the oral argument in TAM, the question was, well, isn't the trademark system designed to support some kind of economic stability? Well, what it's really designed to support is prevention of confusion and protection of the brand owner's rights. And in fact, if Section 2A is constitutional, then brand owner's rights become highly questionable. For example, Eskimos now consider disparaging the worm as Inuit. So the registration for Eskimo pie, out the door. If you called someone a Hebrew, in many contexts, that would be considered disparaging. So it's Hebrew national hot dogs in valor. And we could go on and on about that. And even if their existing registrations are valid, they can't file new registrations for new goods. And let's say, for example, Apple has sexual connotations, then that means Apple can't get a new registration for its newest line of products. The quandary that Section 2A puts the PTO in is best illustrated by Huna Placero. He is actually in the Capitol Hall of Statuary from State of California. Recently made a saint by the Catholic Church. So obviously, the Catholic Church believes he's a good fellow. We have St. Vincent de Paul Society, and we can certainly see that there'll be more registrations for that. In fact, there is a registration in the principal register for Huna Placero. On the other hand, the Native Americans take the position that he committed genocide. He's like Hitler. And I don't think there'd be any doubt that Hitler would be a scandalous mark because of the horrible philosophy that's being pronounced. And so how does the PTO decide for the next application for Huna Placero to grant it or not? And can it do it without inviolating the freedom of political expression or the freedom of religion? And that's not really the position of the trademark office. This is supposed to be just as... The test is a substantial composite of the general public. And so actually, my guess is a substantial composite of the general public is some sort of, I mean, if it's not a majority rule, because I understand there's been cases that have gone as low as like 35% of people, but wouldn't that be the discrimination? You're citing a minority group that maybe takes issue with the name. If they rise to the level of a substantial composite of the general public, then they would satisfy the test and be able to prevent its registration. If they don't, then they wouldn't. That may be how we avoid it, but like Hitler's an example. That's not how we avoid it. That's actually what the test is, right? You need to tell me whether the test is unconstitutional, and I don't see your argument. Well, let's say it was left in the Native Americans were the majority. And they are, because, you know, everyone, I think the majority would agree that Hitler is scandalous. And so, so let's say it's an application for Hitler. And then, but if, you know, but let's say it's Huna Placero instead, then you're denying the Catholic Church, the ability to use Huna Placero, which is something that they strongly believe in. I think the question is pointing out to you that there are different tests for disparagement and for scandalous. For disparagement, it's a substantial composite of the group, the affected group or this disparaged group. For scandalous, it's a substantial composite of the general population. From the standpoint of the First Amendment, does that make any difference? I don't think it makes any difference because the problem with Section 2A in part, and I don't think it's, I don't think Section 2A is unconstitutional as to the false association problem. But to the extent that it's judging content, I think that's the problem. And in fact, when we're talking about, you know, whether your speech is prohibited or allowed, basically what this is allowing is my client, he can't talk in downtown Charlottesville, he can't march in his clothing that says fuck the draft into the L.A. County Courthouse. He can go to Hyde Park, but not Speaker's Corner. And so the government is making value judgments on political and religious and social matters that it's none of its business to be doing under the First Amendment. In fact, that takes us to the next point, the implications of ruling in this case in Enright Town. And no one has really focused on the broader implications, other than I saw in the most if this is allowed, then as in the Kalman case, which I cited in my brief, a state can refuse registration of a corporate name, such as I Choose Hell Productions LLC. And so any of the marks that are refused registration can also be refused a corporate name registration. They could also be refused a city business license. They could also be refused a sales tax permit. So in other words, the government can start getting involved in making decisions about whether pizza is good or not and refusing registrations. And in fact, if this is constitutional, I don't know why you couldn't refuse registration of a TV station license, because in the historical record, we know there's been anti-Semitic hate speech on radio, and we know that there's organizations that have had different ethnic groups, they've not allowed to be bishops in their church, for example. Do we not deny the registrations? I think that is the implication. As to this particular client, the unconstitutional is applied, the system is broken. And in my record, the rules, you can't have misspellings of vulgar words. Well, in the record, I point out about SCUK has been registered, 10 registrations, not a 2A is never raised. Is it just because the applicant was friends with the examining attorney? I don't know why, but that's allowed. My clients whose mark is F-U-C-T, which does not mean fuck, is denied, because I show in the record that F-C-U-K is being used to mean the word fuck. And there is no such F-U-C-T record. Well, phonetically, F-C-U-K doesn't sound like the word, but phonetically, I mean, why don't you pronounce your client's mark? Are you going to tell me it's Fust and there's a little German thing that's missing on top of the U? Well, we don't have, we don't say IBM, we say IBM. The International Trademark Association says it's I-N-T-A. But IBM's trademark initially had a period after I, after B, and after M, making it clear to the world that it was, in fact, an acronym. Unfortunately, I haven't seen that in my lifetime, that the periods for IBM, I've only seen the symbol. And how is it? It's F-U-C-T, it's just like I-N-T-A, or like C-S-U-N, Cal State University Northridge. It's never pronounced as a word? Not to my knowledge. That's what my client doesn't say, that that's the way it works. So, you know, but it's really the question is, is it a misspelling of fucked or fucked? And is, and how can one get through and one's not? That's why... Because it depends on the record. And in this case, the patent office had record evidence from your company's website that demonstrated F-U-C-T on a T-shirt, which your client refers to as the orgy shirt. The orgy shirt contained an image of a lot of naked people engaged in various acts. Okay. Well, thank you. Wait, wait, wait. So everything goes on the basis of the record. You're saying it's F-U-C-T. The trademark office, on the other hand, is looking at how is it going to be interpreted by a substantial composite of the general public? How can I say there's no substantial evidence for their determination that a substantial composite of the general public is going to pronounce it? And it's going to be pronounced like F-U-C-K-E-D, not F-U-C-T. I'm not positive I can say that isn't supported by substantial evidence. I'm also not positive I could say that their determination that your client's purposeful affiliation or however you want to say it, on his mark, he sells things like what he calls an orgy T-shirt. Now, when you see the word F-U-C-T on a T-shirt your client calls an orgy shirt and there's a picture of a bunch of naked people on it, you really think at that point I have to say that their view that the average person would associate your mark with the bad word is not supported by substantial evidence? I have two responses. First, in my brief, I talk about the actual evidence about used marketplace where it's sold. But this is the same issue raised in TAM. In TAM, the bad evidence, we'll say, happened within a year of the second application. In this case, the record shows what my client is currently using. There's no evidence about when that T-shirt was used because they got that from the Google Photos page. It's on your client's website right now. It says it's sold out, by the way, just so you know. Apparently, it's a popular shirt. Sorry. Actually, that I do not know. In addition to that, you know what else is on your client's website right now, which is in the appendix, so I'm not making this up or adding in. All of these things are in the appendix. I'm not adding to the record. But it's that lovely little picture of the three little boys wearing the F-U-C-T shirt and flashing the bird. That's right. But your argument is that their determination that the consumer public, when viewing these images, would not associate the F-U-C-T word with the bad word, is not supported by substantial evidence in light of that record evidence? Well, the question is... The client's intent is not at issue. It's how the composite of people see it. But, you know, first of all, that doesn't really relate to what's in the marketplace, which I think is the key fact. And the fact that we have nearly 20 years without objection when we know that the public likes to object when it is... I'm not saying that there isn't substantial evidence that could have supported the opposite determination, right? But what's the substantial evidence? What's the standard for substantial evidence? I can't give that to you. A scintilla of evidence. Well, more than a scintilla of evidence. More than a scintilla of evidence. The two examples I just gave you are part of this record. Don't those two examples alone satisfy that incredibly low standard? I mean, I'm not saying there wouldn't be substantial evidence to go the other way. I'm not saying you didn't put on evidence that goes the other way. But I have to decide whether or not, under my very deferential standard of review, I can say that there was no basis for going the way they did. Well, I would have... I certainly would argue that that's a small part of it because I showed the line, the whole line, as being sold and manufactured in the current time. And so, you know, I may not be able to convince you on that. But I also think it's very relevant that in this case, and especially it's apparent from the board's opinion, that he's being attacked because of his opinion. And giving the finger doesn't necessarily mean that the t-shirt means fucked. The whole point of my client's brand... What it means is, what the question is, what would a substantial composite of the American public think about this mark when they see it used above an image of somebody giving someone the finger? You're saying it's unreasonable for people to think that F-U-C-T... Well, you also have a t-shirt where the word F-U-C-T is crossed out and your client's trademark is superimposed on it. Yeah, but that is at some indefinite prior time that wasn't entered into the record with any time because I entered in the record what the current use was. And that's relevant. And if we don't know... If it's 20 years ago, that's certainly so attenuated that no consumer is going to see it. And even if there's one photo on the website, that doesn't mean the consumer's substantial composite of the consumers in the stores buying the product are going to think it's vulgar. Okay. Well, you're in your rebuttal time. We'll give you two minutes. Okay. I'll take that. Why don't we hear from the government, Mr. Tanney? Thank you, May. Please, the court. We're content to rest on our briefs on the evidentiary question. Before you do, I would like to ask you one question along those lines. What Mr. Sommer brought up was a belief that the board's opinion went further than just finding a substantial composite of people disliked it, but rather expressed a personal view. I'm sure you read the portions of the board opinion and probably cringed a little because I did, where the board says that applicants' use of this imagery is lax taste, things like that. I mean, doesn't that... I'm not saying the American... I don't think the American public would conclude it lacks taste, and lacking taste doesn't meet the scandalous moral standard either. But certainly, whoever drafted this opinion for the board was making sure to express their applicant's mark, and I didn't think that was a great thing, right? I mean, that's not the way they're supposed to evaluate it, is it? Not because the examiner thinks the mark lacks taste. If you read the opinion as a whole, and it is, as this court has discussed, based on the record, it's clear that the board's ultimate conclusion was premised on the proper standard, on the evidence in the record, and on what a substantial composite of the public would think of this, and how the public would react and interpret this mark. And so the board's decision is not premised on a personal view of a member of the board. It is premised on the record in the case, and the record adequately, amply supports, more than amply supports the conclusion that the board reached. And I'm happy to go into more instances. I think they're covered in the briefs, and have been discussed already. I wanted to turn, unless there are questions on the evidentiary question, to the question that the court posed at the outset of the argument about the possible implications of TAM one way or the other. If the government were to prevail in TAM, then presumably that would mean that the court would leave intact the precedence of this court, like McGinley and Fox and Boulevard, that held that the very provision that's at issue in this case is constitutional, because it is a limitation on a government program relating to goods and services and commerce. And so if the government were to prevail in TAM, then the government would also have to prevail here. And the arguments to the contrary, primarily that the other side is raising, to the extent that he's making arguments that wouldn't apply equally in TAM, it's primarily the argument that the decision here was premised not on an evaluation of the mark, but rather on a view of his extraneous statements in the marketplace. That's the argument that he advanced for why this case is worse constitutionally than TAM. If he were right about that, we don't think he is right about that, then that would be an argument just that the board erred because the board didn't properly apply the statute, didn't consider the mark itself, but instead considered something extraneous that was not relevant to the mark. That might be an argument that he would win this case on the evidence. Again, we think that that's wrong, but that wouldn't be a reason that the scandalous part of the provision would be unconstitutional, even if the question is somewhat more difficult, which is, what happens if the government does not prevail in TAM and if the disparagement provision is invalidated? And on that one, it's difficult for me to give an answer to that today because it would depend heavily upon the rationale that the court gave for invalidating the provision in TAM. There was discussion, as the court is aware, at the argument in TAM about whether the arguments that Mr. Tam was making there would apply equally to the scandalous provision, and I understood him to be saying that some of his arguments would apply across the board to both, but that there was room for the court to just address the disparagement provision and that there were things about either his application particularly or about the disparagement provision as opposed to the scandalous provision. We don't think those arguments are correct, so I'm not going to say that the court should rule that way and then oppose it. But what argument do you have for why, if the disparagement provision is rendered unconstitutional, what argument could even exist in the ether that would allow this provision to stand? Any argument. Any argument at all. It depends why, as I said, it depends why the court says that it's unconstitutional. Let's just say the court says it under the First Amendment. It's facially unconstitutional under the First Amendment. What more would you need to know to be able to delineate what differences exist? I would need to know the constitutional rationale and whether it was something about the disparagement provision itself. Let's try it this way. Is the government's interest in not trademarking scandalous matter greater than its interest in not trademarking disparaging matter? I'm not sure I can say it's greater or lesser. It's related, but they're not necessarily identical. I think there is a chance that the difference would relate to the government's interest. It seems more likely. What is the government's interest in preventing scandalous and immoral trademarks? Well, they're not preventing the trademarks, just to be clear. Registration of the trademark. But the government's interest, at a most general level, the interest is the same, which is that the government is making determinations about which marks are most suitable or which marks the government wants to facilitate enforcement of to promote goods and services. The government and Congress has concluded both as to marks that disparage groups and marks that are scandalous more generally, that it doesn't wish to use its program for those purposes. I think that the most significant difference between the two cases, and it's a little hard for me to say this because I'm not sure if Mr. Tam himself was making this argument, but there was some suggestion that Mr. Tam's use of the mark was making a political statement or was expressing something beyond commercial identifier. We didn't think that that was dispositive in that case by any means, and in fact, he wasn't even really raising it on appeal. But in answer to your question, is there a circumstance in which the court could? That would go to an as-applied theory. That wouldn't go to a facial invalidation if Mr. Tam's mark was delineated as expressive as compared to other marks that wouldn't justify facial invalidation if the court were going to go with that argument. I certainly agree with that, but again, it's a little bit difficult for me to stand here without knowing which of our arguments the court will agree with and which of our arguments the court will reject and to tell you. I think in this case, we would submit that if the government were not to prevail in Tam and if that provision was held to be unconstitutional either as applied or on face, that it's quite likely that supplemental briefing in this case to address the relationship between that holding, which we would then have the benefit of, in this case would be appropriate. But we think that if the government's position in Tam is upheld, that it's unlikely that supplemental briefing would be necessary because it would... But I guess what I'm not certain why... You haven't explained to me why supplemental briefing would be necessary because you haven't explained... I mean, most of your opponent's brief is about the First Amendment and you failed to address it entirely, but certainly you're versed in it because we've had this discussion before. So what would be a basis upon which there is a need for supplemental briefing? Tell me why, if it is rendered facially unconstitutional, what possible difference could there be between that decision and a decision on scandalous and immoral? Anything. Give me any reason. Well, one argument that was made in that... And again, I hesitate because these are not arguments that we think are correct. And so the question is really, are there things the court could say that would distinguish the two? But one argument that was made was that there was a viewpoint component to the disparagement provision, viewpoint-based component, and that that was legally relevant such that they could prevail on that basis. If you agreed with both of those you wouldn't have the same argument in the scandalousness context. Now, again, I don't wish to speculate on how the court is going to resolve the case and say, oh, if you say this and if you phrase it this way, then we win this case. And if you say it that way, we lose this case. If this court wants to entertain a constitutional challenge to an act of Congress based on a recent en banc decision, we think it should be done based on briefing by the parties rather than by my speculation ahead of time about what the opinion is likely to say. But on the flip side, because we do, as we stand here today, have controlling precedent as to this provision, and so we know that if the en banc court doesn't disturb that precedent, then we should prevail on the constitutional issue. Unless there are any additional questions. Okay. Thank you. Thank you, Mr. Tan. Mr. Sommer, you've got two minutes there. Yes, real quickly. Central Hudson, I think, is as important. There has been no government interest established as to why scandalous marks should be refused. That's for the marketplace. And there's no government interest because they concede it still can be used. And to the extent that we're talking about government expenditures, you know, the only real expense after the application is milling out the certificate, a dollar for postage and another dollar for the paper. My client's opinions are relevant to the outcome. His undermark is Friends You Can't Trust. It's authority. He's a youth brand. He does have, in the long past, graphic images of, like, a Doberman. And, of course, Dobermans in California is a big issue. So he's talking about political things, violence, kids being alienated. That's very important. And, in fact, when we get to the question about as applied, the letter F asterisk WRD is registered. And asterisk WRD is registered. If we consider a mark is determined by its either sight or sound or meaning, there's no doubt about what the meaning of that is. So how can that's explicitly the word fucked, how that can be registered, because that's the meaning that my client can't be when my client has a good faith argument about that his means F-U-C-T and, you know, subsidiary is Friends You Can't Trust, counterculture. Thank you. Thank you, Mr. Summers. Thank both.